1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                    June 2009 Grand Jury

11 | UNITED STATES OF AMERICA,     )    CR 08-688(D)-AHM
                                   )
12 |              Plaintiff,        )    F I R S T
                                   )    S U P E R S E D I N G
13 |              v.                )    I N D I C T M E N T
                                   )
14 | JOSE LEON,                     )    [18 U.S.C. § 1962(c): Racketeer
        aka "NeNe,"                )    Influenced and Corrupt
15 | ALEX VALENCIA,                 )    Organizations; 18 U.S.C.
        aka "Gunner,"              )    § 1962(d): Racketeer Influenced
16 | SERGIO MARTINEZ               )    and Corrupt Organizations
        aka "Bird,"               )    Conspiracy; 18 U.S.C. § 1959:
17 | RAFAEL CARRILLO,              )    Violent Crime in Aid of
        aka "Stomper,"            )    Racketeering; 21 U.S.C. § 846:
18 | JOSE GOMEZ,                   )    Conspiracy to Distribute
        aka "Rival,"              )    Cocaine Base in the Form of
19 | JORGE LARA,                   )    Crack Cocaine; 21 U.S.C.
        aka "Oso,"                )    §§ 841(a)(1), 841(b)(1)(A),
20 | LENNIN CATALAN,               )    841(b)(1)(B): Possession with
      IMELDA CATALAN,              )    Intent to Distribute Cocaine
21 | ANDREW GANDARA,               )    Base in the Form of Crack
        aka, "Lil Silent,"        )    Cocaine; 18 U.S.C. § 922(g)(1):
22 | JOSE ALVARADO,                )    Felon in Possession of a
        aka, "Minor,"             )    Firearm; 18 U.S.C. § 924(c)(1):
23 | JUAN LEMUS,                   )    Use of a Firearm in Furtherance
        aka "Bola,"               )    of a Crime of Violence or Drug-
24 | RAUL CARBAJAL,                )    Trafficking Crime; 18 U.S.C.
        aka "Raton,"              )    § 2(a): Aiding and Abetting; 18
25 | MIGUEL LOPEZ,                 )    U.S.C. § 3: Accessory After the
        aka "Shooter,"            )    Fact; 18 U.S.C. §§ 1956(h),
26 | MIGUEL VENANCIO,              )    1956(a)(1): Conspiracy to
      GUILLERMO OCAMPO,            )    Launder Money; 18 U.S.C.
27 |    aka "Slim,"                )    § 982(a)(1) and 21 U.S.C.
                                   )    § 853(a): Criminal Forfeiture]
28                                 )    _____

   CB/AAN: VOCS

```
 1  GERMAN REAL-AMPUDE,            )
        aka "Chispas,"            )
 2  VALENTIN VENCES,              )
    RAFAEL AVILES,                )
 3      aka "Rafa,"               )
    JOSE AVILES,                  )
 4      aka "Papucho,"            )
    DANIEL GUILLEN, and           )
 5  CARLOS ANTHONY CERVANTES,     )
        aka "Psycho,"             )
 6                                )
                                  )
 7                Defendants.     )
 8  ─────────────────────────────  )
```

9       The Grand Jury charges:

10      <u>GENERAL ALLEGATIONS</u>

11      1.  At all relevant times, defendants JOSE LEON, aka "NeNe"

12  ("J. LEON"), ALEX VALENCIA, aka "Gunner" ("VALENCIA"), SERGIO

13  MARTINEZ, aka "Bird" ("S. MARTINEZ"), RAFAEL CARRILLO, aka

14  "Stomper" ("R. CARRILLO"), JOSE GOMEZ, aka "Rival" ("GOMEZ"),

15  JORGE LARA, aka "Oso" ("LARA"), LENNIN CATALAN ("CATALAN"),

16  IMELDA CATALAN ("I. CATALAN"), ANDREW GANDARA, aka "Lil Silent"

17  ("GANDARA"), JOSE ALVARADO, aka "Minor" ("J. ALVARADO"), JUAN

18  LEMUS, aka "Bola" ("LEMUS"), RAUL CARBAJAL, aka "Raton"

19  ("CARBAJAL"), MIGUEL LOPEZ, aka "Shooter" ("LOPEZ"), MIGUEL

20  VENANCIO ("VENANCIO"), GUILLERMO OCAMPO, aka "Slim" ("OCAMPO"),

21  GERMAN REAL-AMPUDE, aka "Chispas" ("REAL-AMPUDE"), VALENTIN

22  VENCES ("VENCES"), RAFAEL AVILES, aka "Rafa" ("R. AVILES"), JOSE

23  AVILES, aka "Papucho" ("J. AVILES"), DANIEL GUILLEN ("GUILLEN"),

24  and CARLOS ANTHONY CERVANTES, aka "Psycho" ("CERVANTES"), and

25  others were members and associates of an organization engaged in,

26  among other things, murder, conspiracy to commit murder,

27  attempted murder, conspiracy to traffic in narcotics, narcotics-

28  trafficking, robbery, extortion, money laundering, and witness

intimidation.  At all relevant times, this organization, known as
the "Avenues" gang, which includes its "Drew Street" gang
members, operated in the Central District of California and
elsewhere.  The Avenues gang, including its leadership,
membership, and associates, constituted an "enterprise," as
defined by Title 18, United States Code, Section 1961(4), that is
a group of individuals associated in fact.  The enterprise
engaged in, and its activities affected, interstate and foreign
commerce.  The enterprise constituted an ongoing organization
whose members functioned as a continuing unit for a common
purpose of achieving the objectives of the enterprise.

<u>BACKGROUND OF THE AVENUES AND DREW STREET GANG</u>

    2.  The Avenues gang is a multi-generational street gang
that was formed in the 1940s and claims the area roughly between
Colorado Boulevard to the North, the 3200 Block of Griffin Street
to the East, San Fernando Road to the South, and Drew Street to
the West as its "territory" in Northeast Los Angeles.  The
Avenues Gang is divided into a number of smaller groups, or
"cliques," based on geography and associations in the
neighborhood controlled by the gang.  The original Avenues
cliques were the Cypress Avenues, the Avenues Assassins, and
Avenues 43rds.  Tagging crews of juveniles also align with this
gang and typically serve as a recruiting base for new members.

    3.  The Avenues gang has been traditionally loyal and
committed to "Mexican Mafia," also known as "La Eme."  Avenues
leaders frequently extort money from local drug traffickers,
members of other gangs, prostitutes, residents, and persons who
maintain businesses in the area controlled by the gang.  Avenues

3

gang members also frequently intimidate, threaten and assault persons in the area as a means to intimidate and control the people in their neighborhoods, including potential witnesses who would testify in court about their crimes. Their crimes typically include acts of violence, ranging from battery to murder, drug-trafficking offenses, witness intimidation, alien smuggling, weapons-trafficking and, very frequently, hate crimes directed against African-American persons who might attempt to reside or be present in the areas controlled by the gang. Members frequently conduct robberies as a means to generate funds for the larger organization and Avenues hierarchy.

4.    The Drew Street gang is a recently formed clique within the Avenues gang. The Drew Street gang is part of the Avenues gang, and it is authorized by the Avenues and the Mexican Mafia (aka, "La Eme") to control the area of Northeast Los Angeles in the neighborhood surrounding the intersection of Drew Street and Estara Avenue. The Drew Street clique of the Avenues gang is headed by Francisco Real, and he is authorized by the Avenues and the Mexican Mafia to act as the "shot-caller" for the Drew Street gang. The Drew Street gang is actively and continually engaged in the distribution of cocaine base in the form of crack cocaine ("crack cocaine"), methamphetamine, and other narcotic drugs. In particular, Drew Street gang leaders obtain narcotic drugs and control the distribution of narcotic drugs by providing "street-level" distribution amounts (typically a few grams of crack cocaine at a time) to numerous Drew Street gang members and associates in the area controlled by the Drew Street gang. The Drew Street gang leaders, in turn, collect extortion payments,

referred to as "taxes," from drug traffickers.  The Drew Street gang also extorts payment from persons who live and maintain businesses in the area controlled by the gang.  Members extract payment under threat of physical violence, including the threat that individuals who do not adhere to the gang's demands will be "green-lighted" by the Mexican Mafia, that is, they will be targeted for murder.

5.  A portion of the "taxes" collected by the Avenues and Drew Street gang leaders is then owed to the Mexican Mafia, and the leaders are required to make payments to representatives of the Mexican Mafia in the area, who, in turn, deliver payment to members of the Mexican Mafia leadership incarcerated within the California prison system.  Avenues and Drew Street gang members also raise funds for the organization by conducting armed home-invasion robberies, in which they target individuals believed to maintain large sums of cash or valuables in their homes.

6.  Members of the Drew Street gang enforce the authority of the gang to commit its crimes by directing acts of violence and retaliation against non-compliant drug-traffickers and rival gang members.  The organization also directs attacks against law enforcement officers and witnesses who would be willing to cooperate with law enforcement for the prosecution of the crimes committed by members of the Drew Street gang.  The Drew Street gang includes approximately 500 members and controls narcotics trafficking, violent crimes, and other activity in the area around the intersection of Drew Street and Estara Avenue in Los Angeles, California.  The Drew Street gang ordinarily is vigilant to the presence of "outsiders," or persons not immediately known

to the gang, who may intentionally or inadvertently attempt to
enter the territory controlled by the gang.  Gang members are
likely to identify such persons and physically threaten or kill
them.  The organization also is hostile to the presence of
African-Americans in Drew Street gang territory.

     7.  The Drew Street and Avenues gang members generally
identify one another through the use of hand gestures, or gang
"signs."  They typically display the letters "A" for Avenues or
the interlocking "L-A" for "Los Avenidas."  Members frequently
wear the "Skull Camp" or "Skull Wear" brand clothing to identify
themselves as members and associates of Drew Street and the
Avenues gang.  The clothing depicts images of human skulls in
various forms, such as a human skull depicted as part of the logo
for the Oakland Raiders football team and, in particular, the
depiction of a human skull wearing a fedora hat.  Gang members
frequently refer to one another as "skulls" and wear baseball
caps for teams whose insignia includes an "A" or "L-A," for
Avenues and Los Avenidas.  Gang tattoos, gang names, and slogans
are also used to identify members and territory controlled by the
gang.  The Drew Street gang also uses spray-painting, or
"tagging," as a sign that demonstrates its control of the area
against rival gang members and the local community.  Gang
"tagging" frequently appears on street signs, walls, buildings,
and portions of the 110 Freeway, Interstate 5, and Highway 2 in
the areas controlled by the gang.  Rival gang members risk
violence from the gang if they attempt to "tag" within the Drew
Street or Avenues-controlled territory.  Drew Street gang members
will frequently tag or display the number "3200," which

6

identifies the block number at the intersection of Drew Street and Estara Avenue.  Members will also often use the number 13 in various forms (i.e., 13, X3, or XIII) to demonstrate loyalty to the Mexican Mafia ("m" being the 13th letter in the alphabet) and that the gang has "sureno" (Southern California) loyalty.  The letters "NELA" are used to identify Northeast Los Angeles gang members, and the number 187 is frequently used by the gang to take "credit" for a murder that has been committed by the gang.

8.  The Avenues and Drew Street gang members maintain a ready supply of firearms, including handguns, shotguns, automatic assault rifles, and machineguns, in order to enforce the authority of the gang.  Such weapons typically are stolen or unregistered, so that the use of the weapons cannot be readily connected to the gang member who either used the weapon or maintained it.  Weapons often are discarded or destroyed after an incident.  Therefore, gang leaders frequently need to maintain a source of supply for additional unregistered or non-traceable firearms.  The Avenues gang, including Drew Street, also controls the activities of its members and enforces its authority and internal discipline by killing, attempting to kill, conspiring to kill, assaulting, and threatening its own members or others who would present a threat to the enterprise.

9.  Leaders of the Avenues gang, including Drew Street gang leaders, recruit and initiate juveniles to join the gang and direct them to commit acts of violence and drug-trafficking crimes on behalf of the gang.  New members frequently are recruited through their participation in a younger "tagging" unit or from a different sect of the larger organization.  New members

7

ordinarily are then "jumped in" to the gang. This initiation process ordinarily requires that the new member is physically beaten by senior, established members of the gang and must demonstrate his resilience during the beating. The new member is then rewarded and frequently provided with a firearm and narcotics.

10. Females are commonly disparaged and addressed derisively in the gang. Female associates, however, are frequently active in narcotics trafficking, as well as the collection and transfer of "tax" payments and narcotics proceeds. Female associates also play an integral role in directing and maintaining communications within the organization, in particular communications with incarcerated gang members and leaders of the organization.

<u>PURPOSES OF THE ENTERPRISE</u>

11. The purposes of the Avenues gang, including its Drew Street members and associates, include, but are not limited to, the following:

a. Enriching members of the Avenues and Drew Street gang through, among other things, control of and participation in the distribution of narcotics in the territory controlled by the Avenues and the Drew Street gang.

b. Maintaining the control and authority of the Avenues gang and its Drew Street members over Drew Street and Avenues territory.

c. Preserving, protecting, and expanding the power of the Avenues and Drew Street gang through the use of intimidation, violence, threats of violence, assault, and murder.

1    d.    Promoting and enhancing the authority of the

2 Avenues and Drew Street gang members and associates.

3                    THE MEANS AND METHODS OF THE ENTERPRISE

4    12.    The means and methods by which the defendants and their

5 co-racketeers conduct and participate in the conduct of the

6 affairs of the Avenues gang, including its Drew Street members

7 and associates, include:

8    a.    Members of the Avenues, including Drew Street gang

9 members, commit, attempt, and threaten to commit acts of

10 violence, including murder, to protect and expand the

11 enterprise's criminal operation, which includes assaults, murder,

12 intimidation and threats of violence directed against rival gang

13 members, law enforcement, and witnesses in criminal cases.

14    b.    Members of the Avenues, including Drew Street gang

15 members, promote a climate of fear through violence and threats

16 of violence.

17    c.    To enforce the authority of the Avenues and Drew

18 Street gang, members use the enterprise to murder, attempt to

19 murder, assault, and threaten those who pose a threat to the

20 enterprise.

21    d.    Participants in the Avenues, including Drew Street

22 gang members, engage in the trafficking of controlled substances

23 as a means to generate income.

24

25

26

27

28

9

COUNT ONE

[18 U.S.C. § 1962(c)]

1.    Paragraphs One through Twelve of the General
Allegations are re-alleged and incorporated by reference as
though fully set forth herein.

THE RACKETEERING OFFENSE

2.    Beginning on a date unknown and continuing to on or
about June 4, 2008, in Los Angeles County, within the Central
District of California, and elsewhere, defendants J. LEON,
VALENCIA, S. MARTINEZ, R. CARRILLO, GOMEZ, LARA, GANDARA, J.
ALVARADO, LEMUS, CARBAJAL, LOPEZ, OCAMPO, REAL-AMPUDE, VENCES, R.
AVILES, J. AVILES, GUILLEN, and CERVANTES, and others known and
unknown to the Grand Jury, being persons employed by and
associated with the Avenues criminal enterprise, including its
Drew Street gang described above, which was an enterprise engaged
in, and the activities of which affected, interstate and foreign
commerce, unlawfully and knowingly did conduct and participate,
directly and indirectly, in the conduct of the affairs of that
enterprise, through a pattern of racketeering activity, that is,
through the commission of the acts set forth below.

THE PATTERN OF RACKETEERING ACTIVITY

3.    The pattern of racketeering activity, as defined in
Title 18, United States Code, Sections 1961(1) and 1961(5),
consisted of the following acts:

Racketeering Act One

Conspiracy to Distribute Narcotics

4.    Beginning on a date unknown to the Grand Jury and
continuing to on or about June 4, 2008, in Los Angeles County,

10

within the Central District of California, and elsewhere, defendants J. LEON, VALENCIA, S. MARTINEZ, R. CARRILLO, LARA, GANDARA, J. ALVARADO, LEMUS, CARBAJAL, LOPEZ, OCAMPO, REAL-AMPUDE, VENCES, R. AVILES, J. AVILES, GUILLEN, CERVANTES, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

a. To distribute at least 50 grams of a mixture or substance containing a detectable amount of cocaine base in the form of crack cocaine ("crack cocaine"), a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A);

b. To distribute at least 5 grams of a mixture or substance containing a detectable amount of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B);

c. To distribute at least 500 grams of a mixture or substance containing a detectable amount of cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).

d. To distribute at least 50 grams of actual methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(A); and

e. To distribute at least 5 grams of actual methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and 841(b)(1)(B).

11

Racketeering Act Two

Conspiracy to Launder Money

5.    Beginning on a date unknown and continuing until on or about June 4, 2008, in Los Angeles County, within the Central District of California, and elsewhere, defendants J. LEON and CARBAJAL, and others, knowingly and intentionally conspired and agreed with each other to conduct financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, that is, conspiracy to distribute crack cocaine, cocaine, and methamphetamine, with the intent to promote the carrying on of said specified unlawful activity, and to conceal and disguise the nature, location, source, ownership, and control the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

Racketeering Act Three

Possession with Intent to Distribute Crack Cocaine

6.    On or about September 20, 2007, in Los Angeles County, within the Central District of California, defendant GUILLEN knowingly and intentionally possessed with the intent to distribute cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Four

Possession with Intent to Distribute Crack Cocaine

7.    On or about October 18, 2007, in Los Angeles County,

12

1  within the Central District of California, defendant OCAMPO

2  knowingly and intentionally possessed with the intent to

3  distribute more than 5 grams, that is, approximately 5.33 grams,

4  of cocaine base in the form of crack cocaine, a schedule II

5  controlled substance, in violation of Title 21, United States

6  Code, Sections 841(a)(1) and 841(b)(1)(B).

7  Racketeering Act Five

8  Distribution of Crack Cocaine

9      8.    On or about November 6, 2007, in Los Angeles County,

10 within the Central District of California, defendant REAL-AMPUDE

11 knowingly and intentionally distributed cocaine base in the form

12 of crack cocaine, a schedule II controlled substance, in

13 violation of Title 21, United States Code, Section 841(a)(1).

14 Racketeering Act Six

15 Distribution of Crack Cocaine

16     9.    On or about November 7, 2007, in Los Angeles County,

17 within the Central District of California, defendant GUILLEN

18 knowingly and intentionally distributed cocaine base in the form

19 of crack cocaine, a schedule II controlled substance, in

20 violation of Title 21, United States Code, Section 841(a)(1).

21 Racketeering Act Seven

22 Distribution of Crack Cocaine

23     10.   On or about November 13, 2007, in Los Angeles County,

24 within the Central District of California, defendant J. ALVARADO

25 knowingly and intentionally distributed cocaine base in the form

26 of crack cocaine, a schedule II controlled substance, in

27 violation of Title 21, United States Code, Section 841(a)(1).

28 //

13

Racketeering Act Eight

Distribution of Crack Cocaine

    11.  On or about November 14, 2007, in Los Angeles County, within the Central District of California, defendant GUILLEN knowingly and intentionally distributed cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Nine

Distribution of Crack Cocaine

    12.  On or about November 19, 2007, in Los Angeles County, within the Central District of California, defendant J. ALVARADO knowingly and intentionally distributed cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Ten

Robbery

    13.  On or about November 26, 2007, in Los Angeles County, within the Central District of California, defendants J. LEON, LARA, and S. MARTINEZ knowingly and intentionally took property from the possession of another, and against their will, by means of force or fear, and within an inhabited dwelling house, in violation of California Penal Code Sections 211, 212.5(a), and 213.

Racketeering Act Eleven

Distribution of Crack Cocaine

    14.  On or about November 27, 2007, in Los Angeles County, within the Central District of California, defendant J. AVILES, knowingly and intentionally distributed cocaine base in the form

of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Twelve

Distribution of Crack Cocaine

15.    On or about December 12, 2007, in Los Angeles County, within the Central District of California, defendant R. AVILES knowingly and intentionally distributed cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Thirteen

Distribution of Crack Cocaine

16.    On or about December 12, 2007, in Los Angeles County, within the Central District of California, defendant LEMUS knowingly and intentionally distributed cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Fourteen

Distribution of Crack Cocaine

17.    On or about December 28, 2007, in Los Angeles County, within the Central District of California, defendants OCAMPO and R. AVILES knowingly and intentionally distributed cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Fifteen

Distribution of Crack Cocaine

18.    On or about January 18, 2008, in Los Angeles County, within the Central District of California, defendant VENCES knowingly and intentionally distributed cocaine base in the form

15

of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Sixteen

Distribution of Crack Cocaine

19.  On or about January 23, 2008, in Los Angeles County, within the Central District of California, defendant VENCES knowingly and intentionally distributed cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Seventeen

Distribution of Crack Cocaine

20.  On or about January 30, 2008, in Los Angeles County, within the Central District of California, defendant R. AVILES knowingly and intentionally distributed cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Eighteen

Conspiracy to Commit Murder

21.  Defendants committed the following acts, any one of which constitutes Racketeering Act Eighteen:

a.  Between on or about February 14, 2008 and February 21, 2008, in Los Angeles County, within the Central District of California, defendants R. CARRILLO, GOMEZ, and VALENCIA unlawfully, willfully, and with premeditation conspired to kill with malice aforethought rival gang member M.S., in violation of California Penal Code, Sections 21a, 31, 182, 187, and 189.

b.  On or about February 21, 2008, in Los Angeles County, within the Central District of California, defendant GOMEZ

16

1  willfully, deliberately, and with premeditation, unlawfully

2  killed with malice aforethought rival gang member M.S., in

3  violation of California Penal Code, Sections 21a, 31, 182, 187,

4  and 189.

5  Racketeering Act Nineteen

6  Attempted Murder

7      22.  On or about February 21, 2008, in Los Angeles County,

8  within the Central District of California, defendant GOMEZ

9  willfully, deliberately, and with premeditation aided, abetted,

10  advised, encouraged, and otherwise participated in the unlawful

11  attempt to kill with malice aforethought Los Angeles Police

12  Officers Langarica and Baine, in violation of California Penal

13  Code, Sections 31, 664, and 187.

14  Racketeering Act Twenty

15  Distribution of Crack Cocaine

16      23.  On or about February 27, 2008, in Los Angeles County,

17  within the Central District of California, defendant VENCES

18  knowingly and intentionally distributed cocaine base in the form

19  of crack cocaine, a schedule II controlled substance, in

20  violation of Title 21, United States Code, Section 841(a)(1).

21  Racketeering Act Twenty-One

22  Distribution of Crack Cocaine

23      24.  On or about February 27, 2008, in Los Angeles County,

24  within the Central District of California, defendant VENCES

25  knowingly and intentionally distributed cocaine base in the form

26  of crack cocaine, a schedule II controlled substance, in

27  violation of Title 21, United States Code, Section 841(a)(1).

28  //

17

<u>Racketeering Act Twenty-Two</u>

<u>Murder</u>

25.  On or about March 9, 2008, in Los Angeles County, within the Central District of California, defendant VALENCIA willfully, deliberately, and with premeditation killed with malice aforethought M.F., in violation of California Penal Code, Sections 21a, 31, 187, 182, and 189.

<u>Racketeering Act Twenty-Three</u>

<u>Attempted Murder</u>

26.  On or about March 9, 2008, in Los Angeles County, within the Central District of California, defendant VALENCIA willfully, deliberately and with premeditation unlawfully attempted to kill with malice aforethought J.M., in violation of California Penal Code, Sections 31, 664, 187, and 189.

<u>Racketeering Act Twenty-Four</u>

<u>Extortion</u>

27.  On or about March 19, 2008, in Los Angeles County, within the Central District of California, defendant CARBAJAL knowingly and intentionally attempted to extort money from others by means of force or threat of force, in violation of California Penal Code, Sections 518, 519, and 520.

<u>Racketeering Act Twenty-Five</u>

<u>Robbery</u>

28.  On or about March 29, 2008, in Los Angeles County, within the Central District of California, defendants GANDARA and CERVANTES knowingly and intentionally took property from the possession of another, and against their will, by means of force or fear, and within an inhabited dwelling house, in violation of

1  California Penal Code Sections 211, 212.5(a), and 213.

2  Racketeering Act Twenty-Six

3  Use of a Communication Facility to Facilitate Narcotics

4  Distribution

5      29.  On or about April 9, 2008, in Los Angeles County,

6  within the Central District of California, defendant J. AVILES

7  knowingly and intentionally used a communication facility,

8  namely, a telephone, in causing or facilitating the commission of

9  acts constituting a felony under the Controlled Substances Act,

10  that is, conspiracy to distribute a controlled substance, in

11  violation of Title 21, United States Code, Sections 846 and

12  841(a)(1), all in violation of Title 21, United States Code,

13  Section 843(b).

14  Racketeering Act Twenty-Seven

15  Distribution of Crack Cocaine

16      30.  On or about April 16, 2008, in Los Angeles County,

17  within the Central District of California, defendant REAL-AMPUDE

18  knowingly and intentionally distributed cocaine base in the form

19  of crack cocaine, a schedule II controlled substance, in

20  violation of Title 21, United States Code, Section 841(a)(1).

21  Racketeering Act Twenty-Eight

22  Possession of Cocaine With Intent to Distribute

23      31.  On or about April 23, 2008, in Los Angeles County,

24  within the Central District of California, defendant J. AVILES

25  knowingly and intentionally possessed with the intent to

26  distribute cocaine, a schedule II controlled substance, in

27  violation of Title 21, United States Code, Section 841(a)(1).

28  //

19

<u>Racketeering Act Twenty-Nine</u>

<u>Distribution of Crack Cocaine</u>

32.   On or about May 5, 2008, in Los Angeles County, within the Central District of California, defendant LOPEZ knowingly and intentionally distributed cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

<u>Racketeering Act Thirty</u>

<u>Distribution of Crack Cocaine</u>

33.   On or about May 6, 2008, in Los Angeles County, within the Central District of California, defendant LOPEZ knowingly and intentionally distributed cocaine base in the form of crack cocaine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

COUNT TWO

[18 U.S.C. § 1962(d)]

1.   Paragraphs One through Twelve of the General
Allegations are re-alleged and incorporated by reference as
though fully set forth herein.

2.   Beginning on a date unknown, and continuing to on or
about June 4, 2008, in Los Angeles County, within the Central
District of California and elsewhere, defendants J. LEON,
VALENCIA, S. MARTINEZ, R. CARRILLO, GOMEZ, LARA, CATALAN, I.
CATALAN, GANDARA, J. ALVARADO, LEMUS, CARBAJAL, LOPEZ, VENANCIO,
OCAMPO, REAL-AMPUDE, VENCES, R. AVILES, J. AVILES, GUILLEN, and
CERVANTES, and others, being persons employed by and associated
with the Avenues and Drew Street criminal enterprise, which
enterprise engaged in and the activities of which affected
interstate and foreign commerce, unlawfully and knowingly
combined, conspired, confederated, and agreed together and with
each other to violate Title 18, United States Code, Section 1962,
that is to conduct and participate, directly and indirectly, in
the conduct of the affairs of the enterprise through a pattern of
racketeering activity, as that term is defined in Title 18,
United States Code, Sections 1961(1) and 1961(5), consisting of
multiple acts involving murder, in violation of California Penal
Code Sections 31, 182, 187, 189, 217.1, and 664; extortion, in
violation of California Penal Code Sections 518, 519, and 520;
robbery, in violation of California Penal Code Sections 211,
212.5(a), and 213; distribution of controlled substances,
including cocaine base in the form of crack cocaine and
methamphetamine, in violation of Title 21, United States Code,

21

1  Sections 841(a)(1), 843(b), and 846; and multiple acts indictable

2  under Title 18, United States Code, Sections 1956 and 1957 (money

3  laundering) and Title 18, United States Code, Section 1512

4  (witness tampering).  It was a further part of the conspiracy

5  that each defendant agreed that a conspirator would commit at

6  least two acts of racketeering in the conduct of the affairs of

7  the enterprise.

8  A.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE

9        ACCOMPLISHED

10       The objects of the conspiracy were to be accomplished in

11  substance as follows:

12       1.    Co-conspirator Francisco Real would direct other Drew

13  Street gang members to conduct robberies, murders, extortion,

14  witness intimidation, and drug trafficking in order to promote

15  and further the activities of the Avenues and Drew Street gang.

16       2.    Co-conspirators Nito Perez, Rigoberto Perez, and Joseph

17  Escandon, and others, would advise co-conspirator Francisco Real

18  about his leadership of the Drew Street gang and obtain

19  authorizations for actions of the Drew Street gang from Avenues

20  and Mexican Mafia ("La Eme") representatives.

21       3.    Co-conspirators Francisco Real, Maria Leon, and Jesus

22  Martinez, Jr., and others, would obtain crack cocaine from

23  defendants CATALAN and I. CATALAN, and other narcotics suppliers.

24       4.    Co-conspirators Francisco Real and Jesus Martinez, Jr.,

25  would provide quantities of crack cocaine for distribution to

26  defendants VALENCIA, S. MARTINEZ, R. CARRILLO, LARA, GANDARA, J.

27  ALVARADO, LEMUS, LOPEZ, OCAMPO, REAL-AMPUDE, VENCES, R. AVILES,

28  J. AVILES, GUILLEN, and CERVANTES, and others.

Case 2:08-cr-00688-GW    Document 1836    Filed 07/02/09    Page 23 of 81    Page ID
#:6844

5.    Defendants VALENCIA, S. MARTINEZ, R. CARRILLO, LARA, CATALAN, GANDARA, J. ALVARADO, LEMUS, LOPEZ, OCAMPO, REAL-AMPUDE, VENCES, R. AVILES, J. AVILES, GUILLEN, and CERVANTES, and others, would distribute crack cocaine in the area controlled by the Avenues and Drew Street gang.

6.    Defendant CARBAJAL and others would collect and extort "tax" payments from narcotics traffickers in the area controlled by the Avenues and Drew Street gang.

7.    Co-conspirators Francisco Real and Jesus Martinez, Jr., and others, would deliver payment to co-conspirators to account for a portion of the "taxes" owed by Francisco Real and the Avenues and Drew Street gang to the Mexican Mafia.

8.    Co-conspirator Francisco Real and others would obtain firearms from a co-conspirator and others and provide them to Avenues and Drew Street Gang members, so they could be used to enforce the authority of the Avenues and Drew Street gang.

9.    Defendants R. CARRILLO, GOMEZ, and VALENCIA, and others, would use firearms to retaliate against, attempt to kill, and kill rival gang members, law enforcement officers, and potential witnesses to criminal activities committed by Avenues and Drew Street gang members, in order to enforce the authority of the Avenues and Drew Street gang.

10.    Defendants J. LEON, LARA, and VENANCIO, and others, would commit armed robberies of persons within their cars, businesses, and residences in the area controlled by the Avenues and Drew Street gang.

11.    Avenues and Drew Street gang members would obtain information about the identities of victims and witnesses who

23

1  might testify or provide information to law enforcement about the

2  crimes of the Avenues and Drew Street gang.

3      12.  Avenues and Drew Street gang members would threaten

4  victims of and potential witnesses to crimes committed by Avenues

5  and Drew Street gang members in order to prevent them from

6  testifying or cooperating with law enforcement about the crimes

7  of the Avenues and Drew Street gang.

8      13.  Avenues and Drew Street gang members would make

9  extortionate threats to local business owners to compel them to

10 pay money to Francisco Real and the Avenues and Drew Street gang

11 for conducting their business in the area controlled by the

12 Avenues and Drew Street gang.

13     14.  Co-conspirator Francisco Real would recruit juveniles

14 and direct their initiation into the Avenues and Drew Street

15 gang.

16 B.  OVERT ACTS

17     In furtherance of the conspiracy, and to accomplish the

18 objects of the conspiracy, defendants J. LEON, VALENCIA, S.

19 MARTINEZ, R. CARRILLO, GOMEZ, LARA, CATALAN, I. CATALAN, GANDARA,

20 J. ALVARADO, LEMUS, CARBAJAL, LOPEZ, VENANCIO, OCAMPO, REAL-

21 AMPUDE, VENCES, R. AVILES, J. AVILES, GUILLEN, and CERVANTES, and

22 others known and unknown to the Grand Jury, committed various

23 overt acts, on or about the following times and dates, within the

24 Central District of California and elsewhere, including but not

25 limited to the following:

26     1.  On October 31, 2002, in Los Angeles, California,

27 defendant J. LEON, and co-conspirator Jesus Martinez, Jr., D.L.,

28 aka "Clever," and a co-conspirator maintained a loaded Intratech

24

9 mm sub-machine gun, a Smith Corona model 03-A3 assault rifle,
explosive devices, 85 grams of crack cocaine, 31 grams of
cocaine, approximately two pounds of marijuana, and approximately
14 grams of methamphetamine at a residence located at 3304 Drew
Street in Los Angeles, California.

2.  On August 2, 2007, defendant GANDARA possessed a loaded
9 mm Beretta handgun, a Smith & Wesson 9 mm handgun, and a Smith
& Wesson .357 Magnum revolver in an apartment at 3351 Drew
Street, in Los Angeles, California.

3.  On August 26, 2007, by telephone using coded language,
defendant J. LEON advised co-conspirator Jesus Martinez, Jr.,
that Mexican Mafia leadership had approved the formation of the
Drew Street clique of Avenues gang under the leadership of co-
conspirator Francisco Real, with co-conspirator Eric Alvarado as
a member, and that defendant J. LEON had been initiated into the
Drew Street Gang by co-conspirators Carlos Renteria, Christian
Serrano, and Juan Hugarte.

4.  On September 2, 2007, by telephone using coded
language, co-conspirator Francisco Real told an unindicted co-
conspirator that co-conspirator Eric Alvarado had been directed
to collect extortionate "tax" payments from traffickers selling
illegal drugs in the area controlled by the Avenues and Drew
Street gang, and the unindicted co-conspirator asked Francisco
Real if Francisco Real would provide him with drugs to sell when
he was released from prison the following year.

5.  On September 2, 2007, by telephone using coded
language, defendant J. LEON told co-conspirator Carlos Renteria
that rival Cypress Park gang members had shot at Avenues and Drew

25

1  Street gang members and asked if Avenues and Drew Street gang

2  members had returned fire in response to the attack.

3       6.   On September 2, 2007, by telephone using coded

4  language, co-conspirator Carlos Renteria told defendant J. LEON

5  that Carlos Renteria wanted co-conspirator Francisco Real to keep

6  his .357 Magnum handgun for him after Carlos Renteria's arrest,

7  and J. LEON told Carlos Renteria that J. LEON would hold his

8  supply of illegal drugs for Carlos Renteria because Carlos

9  Renteria believed that he would be released from custody soon.

10       7.   On September 3, 2007, Avenues and Drew Street gang

11  members possessed approximately 9.5 grams of cocaine base in the

12  form of crack cocaine, approximately 84.59 grams of marijuana, a

13  Ruger 9 mm semi-automatic handgun, a "bullet-proof" vest,

14  ammunition, and a high-capacity 30-round magazine in the rear

15  bedroom of an apartment located at 3218 Drew Street in Los

16  Angeles, California.

17       8.   On September 7, 2007, by telephone using coded

18  language, co-conspirator Francisco Real directed co-conspirator

19  Nicholas Real to be careful about what he discussed on the

20  telephone, stated that he was concerned someone might be

21  "snitching" after the arrests of defendant VALENCIA and co-

22  conspirator Jesus Martinez, and Nicholas Real stated that co-

23  conspirators Carlos Renteria and Eric Alvarado had been arrested

24  the previous Monday.

25       9.   On September 10, 2007, by telephone using coded

26  language, co-conspirator Eric Alvarado asked co-conspirator

27  Francisco Real to contact co-conspirator Joseph Escandon and

28  obtain a list of persons who had been "green-lighted" for death

26

1  because they had not "taken care of business" and would therefore

2  be "smashed" when they went into the prison yard.

3      10.   On September 10, 2007, by telephone using coded

4  language, co-conspirator Eric Alvarado advised co-conspirator

5  Francisco Real about the collection of extortionate "tax"

6  payments from traffickers selling narcotics in the areas

7  controlled by the Avenues and Drew Street gang, and specifically

8  advised Francisco Real to afford defendant R. AVILES one final

9  warning and then, if he still did not pay, to "fuck him up."

10     11.   On September 10, 2007, by telephone using coded

11  language, co-conspirator Eric Alvarado directed co-conspirator

12  Francisco Real to contact co-conspirator Joseph Escandon in order

13  to obtain a "wila," or "green light" authorization for gang

14  members to kill rival Cypress Park gang members who had defied

15  the authority of Eric Alvarado and the Drew Street gang while in

16  prison, and Francisco Real advised Eric Alvarado that these rival

17  gang members had all been "green-lighted" and that Francisco Real

18  would inform Mexican Mafia leaders of the action so that Eric

19  Alvarado would not be retaliated against for killing them.

20     12.   On September 12, 2007, co-conspirator Rigoberto Perez

21  advised co-conspirator Francisco Real that Rigoberto Perez was

22  still actively involved in communicating orders on behalf of the

23  Mexican Mafia and participating in the crimes of the Avenues and

24  Drew Street gang, despite his arrest on August 1, 2007, and that

25  Rigoberto Perez had directed an unidentified co-conspirator to

26  communicate with Francisco Real because Francisco Real had

27  received the authority from the Mexican Mafia to lead the Drew

28  Street clique of the Avenues gang in the areas controlled by the

1  Avenues and Drew Street gang.

2      13.  On September 12, 2007, by telephone using coded

3  language, co-conspirator Rigoberto Perez told co-conspirator

4  Francisco Real that Francisco Real would not be required to pay

5  "taxes" to the Mexican Mafia for his use of "runners" to deliver

6  narcotics for him, because Francisco Real had been authorized by

7  the Mexican Mafia to lead the Drew Street faction of the Avenues

8  gang.

9      14.  On September 13, 2007, co-conspirator Francisco Real

10 possessed an Ithaca 12-gauge shotgun, two SKS 7.62 assault

11 rifles, a Marlin 30-30 rifle, a Ruger revolver, and 313 rounds of

12 ammunition at 3318 Drew Street, in Los Angeles, California.

13     15.  On September 20, 2007, defendant GUILLEN possessed with

14 the intent to distribute approximately 3.35 grams of cocaine base

15 in the form of crack cocaine on Drew Street, in Los Angeles,

16 California.

17     16.  On September 21, 2007, by telephone using coded

18 language, co-conspirator Rigoberto Perez told co-conspirator

19 Francisco Real that co-conspirator Neo Perez would have access to

20 Mexican Mafia members who would verify the authority of persons

21 to appear in the areas controlled by Francisco Real and the Drew

22 Street gang.

23     17.  On September 21, 2007, by telephone using coded

24 language, co-conspirator Francisco Real told co-conspirator

25 Rigoberto Perez that he had initiated defendants VALENCIA and J.

26 LEON, co-conspirator Christian Serrano, and a juvenile into the

27 Drew Street clique of the Avenues gang.

28     18.  On September 22, 2007, by telephone using coded

language, co-conspirator Francisco Real told co-conspirator
Nicholas Real that no one could stop the Drew Street clique of
the Avenues gang from selling narcotics in the area it
controlled, that co-conspirator Neo Perez was afraid to come into
the area controlled by the Drew Street clique of the Avenues
gang, and that Neo Perez could enter the area controlled by the
Drew Street clique of the Avenues gang as long as he did not
display antagonism toward the gang's members.

19.  On October 18, 2007, defendant OCAMPO and co-
conspirators William Real and Jonathan Mendoza possessed with the
intent to distribute approximately 5.45 grams of crack cocaine, a
skull belt to identify membership in the Avenues and Drew Street
gang, a loaded .32 caliber revolver, and approximately .05 grams
of methamphetamine in the area controlled by the Avenues and Drew
Street gang.

20.  On October 19, 2007, by telephone using coded language,
co-conspirator Francisco Real told co-conspirator Rigoberto Perez
that defendant OCAMPO and co-conspirators William Real and
Jonathan Mendoza had been arrested on October 17, 2007, but that
co-conspirator Christian Serrano had escaped, and Rigoberto Perez
stated that they had been "stupid" because they had been using
narcotics.

21.  On October 25, 2007, defendant LARA possessed an
assault rifle, a .357 magnum revolver, and ammunition at 3323
Drew Street in Los Angeles, California.

22.  On November 7, 2007, defendant GUILLEN sold
approximately .41 grams of crack cocaine on Drew Street in Los
Angeles, California.

23.  On November 6, 2007, defendant REAL-AMPUDE sold approximately .35 grams of cocaine base on Drew Street in Los Angeles, California.

24.  On November 7, 2007, defendant GUILLEN and co-conspirator Rafael Garcia sold approximately .23 grams of crack cocaine on Drew Street in Los Angeles, California.

25.  On November 8, 2007, defendant VENCES and an unindicted co-conspirator sold approximately .60 grams of crack cocaine on Drew Street in Los Angeles, California.

26.  On November 13, 2007, defendant J. ALVARADO sold approximately .84 grams of crack cocaine on Drew Street in Los Angeles, California.

27.  On November 14, 2007, defendant GUILLEN sold approximately .14 grams of crack cocaine on Drew Street in Los Angeles, California.

28.  On November 14, 2007, defendant VENCES sold approximately .63 grams of crack cocaine on Drew Street in Los Angeles, California.

29.  On November 14, 2007, defendant VENCES and co-conspirator Hector Navarette sold approximately 3.05 grams of crack cocaine on Drew Street in Los Angeles, California.

30.  On November 19, 2007, defendant J. ALVARADO sold approximately .37 grams of crack cocaine on Drew Street in Los Angeles, California.

31.  On November 26, 2007, defendants J. LEON, LARA, and S. MARTINEZ used a Ruger 9 mm handgun and an M-11 assault rifle to rob four victims at a residence on Marmion Way, in an area controlled by the Drew Street gang.

32.  On November 27, 2007, defendant J. AVILES sold approximately .75 grams of crack cocaine in the area of Drew Street in Los Angeles, California.

33.  On November 27, 2007, by telephone using coded language, defendant J. LEON asked co-conspirator Joanna Fuerte if she had been able to identify the witnesses who might be able to identify him as having committed the robbery on November 26, 2007, and J. LEON asked Joanna Fuerte if anyone had located a firearm that he and defendants LARA and S. MARTINEZ had attempted to hide after the robbery.

34.  On November 27, 2007, defendant VENCES sold approximately .65 grams of crack cocaine on Drew Street in Los Angeles, California.

35.  On November 28, 2007, by telephone using coded language, defendant J. ALVARADO directed co-conspirator Oberlin Hernandez to collect extortionate tax payments from "paisas" who were trafficking narcotics in the area controlled by the Drew Street gang.

36.  On November 29, 2007, by telephone using coded language, defendant S. MARTINEZ directed an unindicted co-conspirator to lie to S. MARTINEZ's parole officer and falsely claim that he and defendants J. LEON and LARA had merely been walking together near Avenue 53 in Los Angeles, California, when they robbed two victims on November 26, 2007, and S. MARTINEZ also stated that co-conspirator Francisco Real would hire attorneys to represent each of the Drew Street gang members involved in this crime.

37.  On November 30, 2007, by telephone using coded

31

language, defendant J. LEON told co-conspirator Francisco Real

that Francisco Real needed to require drug traffickers working

for him to sell more narcotics and stated that he had $30,000

saved, and Francisco Real stated that he had paid $10,000 in

bills, including depositing funds for gang members who were

incarcerated and $2,000 for co-conspirator Mayra Alejandra

Fajardo to pay for a residence on Drew Street.

    38.  On December 4, 2007, by telephone using coded language,

co-conspirator Francisco Real told defendant J. LEON that

Francisco Real had a supply of narcotics that he would sell in

order to raise money to pay for J. LEON's legal costs for

criminal charges brought against J. LEON.

    39.  On December 6, 2007, by telephone using coded language,

defendant J. LEON told co-conspirator Francisco Real that law

enforcement officers had been able to locate him after he

committed a robbery because two co-conspirators had followed him

to the place he had been hiding, but added that he believed he

had successfully hidden the weapons used in the robbery before

being arrested, and Francisco Real stated that he would search in

the area where J. LEON had hidden the weapons.

    40.  On December 8, 2007, by telephone using coded language,

defendant J. ALVARADO directed an unindicted co-conspirator to

collect extortionate "tax" payments from narcotics traffickers

operating in the area controlled by the Avenues and Drew Street

gang and to call him while she collected the "taxes" so that J.

ALVARADO could speak to the traffickers.

    41.  On December 12, 2007, defendant R. AVILES sold

approximately .35 grams of crack cocaine on Drew Street, in Los

32

1  Angeles, California.

2      42.  On December 12, 2007, defendant LEMUS and a co-

3  conspirator sold approximately .56 grams of crack cocaine on Drew

4  Street, in Los Angeles, California.

5      43.  On December 14, 2007, by telephone using coded

6  language, defendant S. MARTINEZ told co-conspirator Francisco

7  Real that S. MARTINEZ had learned the identity of a witness who

8  would be called on to testify against a Drew Street gang member

9  known as "Fly," and that S. MARTINEZ would "get at" the witness

10  to prevent the witness from testifying.

11      44.  On December 28, 2007, defendants OCAMPO and R. AVILES,

12  and co-conspirator Raul Borja, sold approximately .94 grams of

13  crack cocaine on Drew Street, in Los Angeles, California.

14      45.  On January 1, 2008, by telephone using coded language,

15  co-conspirator Francisco Real told defendant J. LEON that

16  Francisco Real was "cutting" up and selling narcotics "as

17  always," and that their father was out selling narcotics and

18  making money "every day."

19      46.  On January 11, 2008, co-conspirator Francisco Real

20  directed J.R., defendant VENANCIO, and other Drew Street gang

21  members to conduct a home-invasion robbery of a residence located

22  at 240 South Avenue 54, Los Angeles, California.

23      47.  On January 11, 2008, defendant VENANCIO, J.R., and

24  other unidentified Avenues and Drew Street gang members wore ski

25  masks and bandanas, carried firearms, and invaded a residence

26  located at 240 South Avenue 54, Los Angeles, California, in order

27  to conduct a robbery, before one of the victims shot and killed

28  J.R. during the course of the robbery.

33

48. On January 11, 2008, by telephone using coded language, defendant S. MARTINEZ told an unindicted co-conspirator that co-conspirator Francisco Real was holding money for S. MARTINEZ while S. MARTINEZ was incarcerated, and S. MARTINEZ then used the telephone to speak to a small child in order to teach the child to yell, "Fuck a nigger!"

49. On January 12, 2008, by telephone using coded language, co-conspirator Francisco Real told defendant J. LEON that their fellow Avenues and Drew Street gang member J.R. had been killed during the robbery on January 11, 2008, and that Francisco Real knew the identity of the person who had killed J.R., but Francisco Real did not want to say the name over the telephone.

50. On January 18, 2008, defendant VENCES and co-conspirator Christina Cruz sold approximately .68 grams of crack cocaine on Drew Street, in Los Angeles, California.

51. On January 23, 2008, defendant VENCES and co-conspirator Christina Cruz sold approximately .46 grams of crack cocaine on Drew Street, in Los Angeles, California.

52. On January 28, 2008, by telephone, defendant S. MARTINEZ told an unindicted co-conspirator that defendant J. LEON had hired an attorney to represent all of the Avenues and Drew Street gang members who had been charged with having committed the home-invasion robbery they committed on November 26, 2007, and S. MARTINEZ said that the attorney would ask for the case to be dismissed the following week, which was after the witnesses were scheduled to identify them as the robbers.

53. On January 30, 2008, defendant R. AVILES sold approximately .67 grams of crack cocaine on Drew Street, in Los

1 Angeles, California.

2    54.  On January 30, 2008, co-conspirator Mayra Alejandra
3 Fajardo told co-conspirator Francisco Real that defendant CATALAN
4 had been trying to contact Francisco Real, and Francisco Real
5 directed Mayra Alejandra Fajardo to tell CATALAN that Francisco
6 Real needed a quantity of narcotics.

7    55.  On February 1, 2008, co-conspirator Francisco Real
8 maintained a bullet-proof vest and numerous rounds of ammunition
9 at his residence on Drew Street.

10   56.  On February 5, 2008, by telephone using coded language,
11 defendant VENCES asked co-conspirator Francisco Real if Francisco
12 Real could distribute more narcotics to VENCES in addition to the
13 narcotics that Francisco Real provided to him the previous day.

14   57.  On February 4, 2008, by telephone using coded language,
15 defendant LEMUS told co-conspirator Francisco Real that LEMUS was
16 going to send co-conspirator Christina Cruz to deliver a payment
17 of $300 to Francisco Real.

18   58.  On February 5, 2008, by telephone using coded language,
19 co-conspirator Francisco Real told co-conspirator Neo Perez that
20 the Drew Street gang had recruited defendant LOPEZ into the Drew
21 Street gang and that they were going to "jump" him into the gang
22 that day.

23   59.  On February 9, 2008, by telephone using coded language,
24 defendant LEMUS told co-conspirator Francisco Real that his
25 children were with him on the weekend and that he would deliver
26 the "tax" payment for trafficking narcotics to Francisco Real
27 later.

28   60.  On February 12, 2008, defendant R. AVILES possessed

35

1  approximately 1.68 grams of crack cocaine and fought with law

2  enforcement officers on Drew Street, in Los Angeles, California.

3       61.  On February 14, 2008, by telephone using coded

4  language, co-conspirator Francisco Real asked defendant VENCES if

5  VENCES needed additional narcotics that day, and VENCES stated

6  that he still had some narcotics remaining but would collect

7  money to pay Francisco Real for additional amounts.

8       62.  On February 14, 2008, by telephone using coded

9  language, co-conspirator Francisco Real sought authorization from

10  co-conspirator Neo Perez to direct an attack on rival Cypress

11  Park gang members during a funeral proceeding, even though the

12  Cypress Park gang was not on the Mexican Mafia "green light"

13  list, and Neo Perez advised that Francisco Real could direct the

14  attack.

15       63.  On February 18, 2008, co-conspirator Francisco Real

16  told co-conspirator Neo Perez that Francisco Real was

17  anticipating an attack by rival Cypress Park gang members in

18  order to assert their authority to distribute narcotics in the

19  Drew Street area, and Francisco Real planned an attack on the

20  Cypress Park gang in response to the threat.

21       64.  On February 19, 2008, prior to a February 21, 2008

22  attack on a rival Cypress Park gang member and LAPD officers,

23  now-deceased Avenues and Drew Street gang member D.L., aka

24  "Clever," told an unidentified co-conspirator that he was loading

25  multiple firearms, and D.L. asked the unidentified co-conspirator

26  to bring bullet-proof vests for the attack.

27       65.  On February 20, 2008, unidentified Avenues and Drew

28  Street gang members stood in front of the residence of D.C. and

36

1  shouted racial epithets at D.C. in order to persuade D.C. to move

2  from Drew Street, because he was African-American.

3      66.  On February 21, 2008, by telephone using coded

4  language, co-conspirator Miguel Hernandez told co-conspirator

5  Francisco Real that he observed Avenues and Drew Street gang

6  member D.L. with a firearm.

7      67.  On February 21, 2008, defendants R. CARRILLO, GOMEZ,

8  and VALENCIA, and D.L., murdered rival Cypress Park gang member

9  M.S. by shooting M.S. multiple times as he walked his two year-

10 old granddaughter near Avenues and Drew Street gang territory.

11     68.  On February 21, 2008, defendant GOMEZ and D.L.

12 attempted to kill Los Angeles Police Department officers on Drew

13 Street by shooting at them with an assault rifle and a handgun,

14 and defendant R. CARRILLO fled from the scene in a car.

15     69.  On February 22, 2008, by telephone using coded

16 language, co-conspirator Francisco Real told an unidentified co-

17 conspirator that D.L. had been killed in the attack on LAPD

18 officers and stated that "shit happens."

19     70.  On February 22, 2008, by telephone using coded

20 language, co-conspirator Francisco Real told an unidentified co-

21 conspirator that defendant GOMEZ also had participated and been

22 injured in the February 21, 2008 attacks with D.L. and that

23 others had escaped, but Francisco Real stated he did not want to

24 identify these individuals over the telephone.

25     71.  On February 22, 2008, by telephone using coded

26 language, defendant S. MARTINEZ discussed the February 21, 2008

27 attacks with an unindicted co-conspirator, who was present at co-

28 conspirator Francisco Real's residence.

37

72. On February 22, 2008, by telephone using coded language, defendant R. CARRILLO told co-conspirator Francisco Real that R. CARRILLO was hiding from law enforcement after the February 21, 2008 attacks, and Francisco Real told R. CARRILLO that law enforcement had found the weapon used in the attacks and that they should meet in person to discuss the attacks, but that R. CARRILLO should wait for Francisco Real to call him and not initiate a call to Francisco Real.

73. On February 22, 2008, by telephone using coded language, defendant CARBAJAL arranged to meet with co-conspirator Felipe Talamante in order to collect a "tax" payment on behalf of co-conspirator Francisco Real.

74. On February 26, 2008, by telephone using coded language, defendant R. CARRILLO told co-conspirator Francisco Real that R. CARRILLO had been apprehended by law enforcement and charged with murder, and he had been told that defendant GOMEZ had "snitched" on him, and Francisco Real told R. CARRILLO to stay alert and be careful in his conversations because his calls were probably being recorded.

75. On February 27, 2008, by telephone using coded language, co-conspirator Juana Orrostieta told co-conspirator Francisco Real that she would deliver a "tax" payment to him, and Francisco Real directed her to deliver the payment to defendant CARBAJAL.

76. On March 9, 2008, defendant VALENCIA identified himself as an Avenues gang member at a residence in Northridge, California, and then shot J.M. and M.F., killing M.F.

77. On March 11, 2008, by telephone using coded language,

co-conspirator Francisco Real told co-conspirator Neo Perez that
two "paisas" had identified defendant LARA in court as having
been one of the perpetrators of the November 26, 2007 robbery,
but they had not identified defendants J. LEON or S. MARTINEZ.

78.   On March 11, 2008, by telephone using coded language,
defendant CARBAJAL told co-conspirator Felipe Talamante that co-
conspirator Francisco Real was busy at that time, but that Felipe
Talamante needed to call Francisco Real concerning the court
proceedings from earlier that day.

79.   On March 13, 2008, by telephone, an unindicted co-
conspirator told co-conspirator Francisco Real that defendant J.
LEON would likely be held to answer to the charges related to the
November 26, 2007 robbery because the victims had appeared and
identified him and that the unindicted co-conspirator and
Francisco Real would then need to meet and plan what they would
do next.

80.   On March 17, 2008, by telephone using coded language,
co-conspirator Francisco Real arranged to purchase cocaine and
crack cocaine from defendant CATALAN.

81.   On March 17, 2008, by telephone using coded language,
defendant CATALAN advised co-conspirator Miguel Hernandez that
CATALAN would deliver cocaine and crack cocaine for co-
conspirator Francisco Real and Miguel Hernandez, and CATALAN also
told Miguel Hernandez that co-conspirator Francisco Campos had
reported to CATALAN that Miguel Hernandez had previously been
"short" in his payment for narcotics.

82.   On March 17, 2008, co-conspirator Francisco Campos
drove to a residence located on Poinsettia Avenue, in Long Beach,

California, and took delivery of approximately 111.9 grams of crack cocaine and approximately 27.7 grams of methamphetamine for defendant CATALAN.

83.  On March 17, 2008, by telephone using coded language, co-conspirator Francisco Campos advised defendant CATALAN that law enforcement officers had seized his car with the crack cocaine and cocaine that he had attempted to deliver to co-conspirators Francisco Real and Miguel Hernandez.

84.  On March 17, 2008, defendant CATALAN told defendant I. CATALAN that law enforcement officers had seized the car driven by co-conspirator Francisco Campos, and I. CATALAN asked CATALAN where the narcotics had been hidden in the car.

85.  On March 17, 2008, by telephone using coded language, defendant CATALAN again discussed the narcotics seizure with defendant I. CATALAN, and defendant I. CATALAN stated that they were fortunate the officers had not searched co-conspirator Francisco Campos' person.

86.  On March 17, 2008, by telephone using coded language, co-conspirator Miguel Hernandez asked defendant CATALAN if CATALAN had already sent co-conspirator Francisco Campos to deliver narcotics to Miguel Hernandez, and CATALAN told Miguel Hernandez that law enforcement had seized Francisco Campos' car with the narcotics and CATALAN would need to find a different driver for the next delivery.

87.  On March 17, 2008, by telephone using coded language, defendant CATALAN arranged with co-conspirator Jose Martinez-Madrigal to deliver narcotics with co-conspirator Francisco Campos for CATALAN, in exchange for $250.

40

88.  On March 17, 2008, co-conspirators Francisco Campos and
Jose Martinez-Madgrigal transported packages containing
approximately 109.8 grams of crack cocaine and labeled for
delivery to co-conspirators Francisco Real and Miguel Hernandez,
as well as foil that contained approximately 17.1 grams of actual
methamphetamine.

89.  On March 17, 2008, by telephone using coded language,
co-conspirator Francisco Campos told defendant CATALAN that law
enforcement officers had stopped him again and found the
narcotics, and Francisco Campos warned CATALAN that law
enforcement was probably watching him.

90.  On March 17, 2008, by telephone using coded language,
co-conspirator Francisco Campos told defendant CATALAN that law
enforcement officers were going to arrest co-conspirator Jose
Martinez-Madrigal, and that Francisco Campos could not confirm
whether officers had located all of the narcotics, but that law
enforcement would find the remainder of the narcotics if they
continued searching the car.

91.  On March 17, 2008, by telephone using coded language,
defendant CATALAN told defendant I. CATALAN that co-conspirator
Francisco Campos had been stopped by law enforcement again and
that co-conspirator Jose Martinez-Madrigal would be arrested
because officers had found the narcotics in the car.

92.  On March 19, 2008, by telephone using coded language,
defendant CARBAJAL and co-conspirator Francisco Real contacted
J.A. and told J.A. that Francisco Real would afford J.A. twenty-
four hours to comply with Francisco Real's demands for an
extortion payment of $30,000 for J.A.'s tire shop, but that

1  Francisco Real already knew where to find J.A.'s other business
2  and had already located family members of J.A., in the event that
3  J.A. resolved not to pay Francisco Real.

4      93.  On March 19, 2008, by telephone, co-conspirator
5  Francisco Real spoke to V., who owned the tire shop that adjoined
6  the shop of J.A., and told V. that J.A. had until 6:00 p.m. the
7  next day to deliver $30,000 as an extortion payment to Francisco
8  Real, either in the form of $30,000 cash or by delivering a
9  Hummer truck to Francisco Real.

10      94.  On March 19, 2008, by telephone, co-conspirator
11  Francisco Real told V. that Francisco Real knew who V. was, knew
12  what he looked like and knew the car that V. drove, that
13  Francisco Real was willing to meet with V. and guarantee V.'s
14  safety for the meeting, but that Francisco Real would "hit" each
15  of their businesses if V. and J.A. did not deliver a $30,000
16  extortion payment to Francisco Real, and that V. and J.A. should
17  "know the consequences" of their decision.

18      95.  On March 19, 2008, by telephone, V. told co-conspirator
19  Francisco Real that he did not understand why V. or J.A. had to
20  pay Francisco Real, and Francisco Real stated that their
21  businesses were in Francisco Real's territory.

22      96.  On March 19, 2008, defendant CARBAJAL, co-conspirator
23  Francisco Real, and an unidentified co-conspirator drove to the
24  location of J.A.'s businesses, in Los Angeles, California, told
25  victim J.A. that Francisco Real controlled the area in which the
26  shop was located and that J.A. would be required to pay $30,000
27  to Francisco Real or Francisco Real would kill him and burn his
28  businesses, and CARBAJAL told J.A. that he would not be permitted

1 to call the police.

2     97.  On March 29, 2008, defendants GANDARA and CERVANTES and

3 an unindicted co-conspirator robbed victims K.C., A.P., and J.P.

4 at gunpoint in the driveway of a residence located on Drew

5 Street, in Los Angeles California.

6     98.  On March 29, 2008, by telephone using coded language,

7 defendant LOPEZ asked co-conspirator Francisco Real to permit

8 LOPEZ to pay less than the full amount of the "tax" payment that

9 LOPEZ owed because LOPEZ only had $100 at that time.

10     99.  On April 9, 2008, by telephone using coded language,

11 co-conspirator Maria Leon directed defendant J. AVILES to deliver

12 the narcotics to Maria Leon that J. AVILES would ordinarily

13 deliver to co-conspirator Francisco Real.

14     100.  On April 10, 2008, by telephone using coded language,

15 co-conspirator Francisco Real directed defendant CATALAN to

16 deliver narcotics to Francisco Real that day, and CATALAN told

17 Francisco Real the amount of money Francisco Real owed CATALAN

18 for narcotics.

19     101.  On April 10, 2008, by telephone using coded language,

20 defendant CATALAN advised defendant I. CATALAN that CATALAN was

21 going to deliver narcotics, and I. CATALAN asked if CATALAN would

22 pick her up before making the delivery.

23     102.  On April 10, 2008, defendant CATALAN possessed

24 approximately 57.1 grams of crack cocaine in the center console

25 area of a Nissan Maxima.

26     103.  On April 10, 2008, defendants CATALAN and I. CATALAN

27 possessed approximately 502.8 grams of crack cocaine; 24.1 grams

28 of cocaine; items used to manufacture crack cocaine, including

43

glassware, pots, and baking soda; a scale; containers; and approximately $2,310 in United States currency at a residence located on Cummings Lane, in Long Beach, California.

104. On April 11, 2008, by telephone using coded language, defendant REAL-AMPUDE told co-conspirator Francisco Real that they could not obtain narcotics from his brother, but that REAL-AMPUDE would provide a half-ounce of narcotics to Francisco Real, and Francisco Real said that he would contact defendant CARBAJAL to determine if they could obtain narcotics from co-conspirator Francisco Campos' sister.

105. On April 14, 2008, by telephone using coded language, defendant I. CATALAN told co-conspirator Francisco Real that I. CATALAN would deliver narcotics to Francisco Real on a weekly basis, instead of everyday, as defendant CATALAN had done prior to his arrest, and Francisco Real told I. CATALAN to take all the narcotics to him and he would deliver the narcotics to the traffickers on Drew Street.

106. On April 16, 2008, defendant REAL-AMPUDE sold approximately .65 grams of crack cocaine on Drew Street, in Los Angeles, California.

107. On April 22, 2008, by telephone using coded language, co-conspirator Francisco Real directed defendant CARBAJAL to collect proceeds from narcotics sales and to then direct co-conspirator Mayra Alejandra Fajardo to document those persons who had not paid.

108. On April 23, 2008, defendant J. AVILES possessed with the intent to distribute approximately 18.87 grams of cocaine at his residence in Los Angeles, California.

109. On May 4, 2008, by telephone using coded language, defendant LEMUS asked co-conspirator Francisco Real to deliver crack cocaine to co-conspirator Arely Albarran-Silva, and Francisco Real directed LEMUS to instruct Albarran-Silva to come to Francisco Real's residence to obtain crack cocaine.

110. On May 5, 2008, defendant LOPEZ and co-conspirator Luis Vargas sold approximately .63 grams of crack cocaine on Drew Street, in Los Angeles, California.

111. On May 6, 2008, defendant LOPEZ sold approximately 3.46 grams of crack cocaine on Drew Street, in Los Angeles, California.

112. On May 15, 2008, by telephone using coded language, co-conspirator Miguel Hernandez asked Francisco Real if law enforcement officers had identified a location where they stored narcotics and ammunition, and Francisco Real told Miguel Hernandez that they had not identified the location yet.

113. On May 15, 2008, by telephone using coded language, co-conspirator Mayra Alejandra Fajardo asked co-conspirator Francisco Real if law enforcement officers were likely to identify the location in the back of a residence where they had hidden narcotics and ammunition.

114. On May 15, 2008, by telephone using coded language, an unindicted co-conspirator told Francisco Real that law enforcement officers had identified the location where they had hidden narcotics and ammunition.

115. On May 15, 2008, co-conspirators Francisco Real, Jesus Martinez, Jr., Miguel Hernandez, and Mayra Alejandra Fajardo possessed approximately 46.6 grams of crack cocaine, 13 grams of

methamphetamine, plastic bags, containers, digital scales, and ammunition.

116. On May 17, 2008, by telephone using coded language, co-conspirator Francisco Real told defendant REAL-AMPUDE that Francisco Real had obtained narcotics for distribution, and REAL-AMPUDE told Francisco Real that he wanted some of the narcotics and that he would come to Francisco Real's location to help him.

117. On May 22, 2008, by telephone using coded language, defendant LEMUS arranged to obtain crack cocaine from co-conspirator Francisco Real.

118. On May 22, 2008, by telephone using coded language, co-conspirator Francisco Real directed co-conspirator Mayra Alejandra Fajardo to deliver 32 "pieces" of crack cocaine to defendant LEMUS and advised Mayra Alejandra Fajardo that LEMUS would pay $300.

119. On May 22, 2008, defendant LEMUS possessed approximately 4.32 grams of crack cocaine and a .25 caliber handgun near Drew Street in Los Angeles, California.

THE GRAND JURY FURTHER ALLEGES THAT:

1. Beginning on a date unknown and continuing to on or about June 4, 2008, in Los Angeles County, within the Central District of California, defendants J. LEON, VALENCIA, S. MARTINEZ, R. CARRILLO, LARA, CATALAN, I. CATALAN, GANDARA, J. ALVARADO, LEMUS, CARBAJAL, LOPEZ, OCAMPO, REAL-AMPUDE, VENCES, R. AVILES, J. AVILES, GUILLEN, and CERVANTES, and others known and unknown to the Grand Jury, knowingly and intentionally conspired and agreed with each other to distribute at least 50 grams of a mixture or substance containing a detectable amount of cocaine

46

1   base in the form of crack cocaine, a schedule II controlled

2   substance, in violation of Title 21, United States Code, Sections

3   846, 841(a)(1), and 841(b)(1)(A).

4       2.  On or about February 21, 2008, in Los Angeles County,

5   within the Central District of California, defendants R.

6   CARRILLO, GOMEZ, and VALENCIA did unlawfully, willfully,

7   deliberately and with premeditation conspire to kill with malice

8   aforethought rival gang member M.S., in violation of California

9   Penal Code, Sections 21a, 31, 182, and 187.

10      3.  On or about February 21, 2008, in Los Angeles County,

11  within the Central District of California, defendant GOMEZ

12  willfully, deliberately, and with premeditation, unlawfully

13  killed with malice aforethought rival gang member M.S., in

14  violation of California Penal Code, Sections 21a, 31, 182, 187,

15  and 189.

16      4.  On or about February 21, 2008, in Los Angeles County,

17  within the Central District of California, defendant GOMEZ:

18      a.  Unlawfully did aid, abet, encourage, and otherwise

19  participate in the unlawful attempt to kill with malice

20  aforethought Los Angeles Police Department Officers Langarica and

21  Baine in order to prevent the performance of Officer Langarica

22  and Officer Baine's official duties, in violation of California

23  Penal Code, Sections 21a, 31, 664, and 217.1(b); and

24      b.  Unlawfully, willfully, deliberately, and with

25  premeditation and malice aforethought, did aid, abet, advise,

26  encourage and otherwise participate in the attempted murder of

27  Los Angeles Police Department Officers Langarica and Baine, in

28  violation of California Penal Code, Sections 21a, 31, 664, 187,

47

and 189.

    5.    On or about March 9, 2008, in Los Angeles County, within
the Central District of California, defendant VALENCIA,
willfully, deliberately, and with premeditation, unlawfully
killed with malice aforethought M.F., in violation of California
Penal Code, Sections 21a, 31, 182, 187, and 189.

    6.    On or about March 9, 2008, in Los Angeles County,
within the Central District of California, defendant VALENCIA,
willfully, deliberately, and with premeditation, unlawfully
attempted to kill with malice aforethought J.M., in violation of
California Penal Code, Sections 21a, 31, 182, 187, and 189.

COUNT THREE

[18 U.S.C. § 1959(a)(3); 18 U.S.C. § 3]

1.    Paragraphs One through Twelve of the General
Allegations are hereby incorporated and re-alleged herein as if
set forth in full.

2.    At all times relevant to this Indictment, the Avenues
gang, including its Drew Street members and associates, as
described more particularly in paragraphs One through Twelve of
the General Allegations, which paragraphs are incorporated and
re-alleged herein as if set forth in full, constituted an
enterprise as that term is defined in Title 18, United States
Code, Section 1959(b)(2), that is, a group of individuals
associated in fact, which was engaged in, and the activities of
which affected, interstate and foreign commerce.

3.    At all times relevant to this Indictment, the Avenues
gang, including its Drew Street members and associates, through
its members and associates, engaged in racketeering activity, as
defined in Title 18, United States Code, Sections 1959(b)(1) and
1961(1), that is, acts involving murder, robbery, and extortion,
in violation of the California Penal Code; the distribution of
controlled substances, including cocaine base in the form of
crack cocaine and methamphetamine, in violation of Title 21,
United States Code, Sections 841(a)(1), 843(b), and 846; and acts
indictable under Title 18, United States Code, Sections 1956 and
1957 (money laundering).

4.    On or about November 26, 2007, in Los Angeles County,
within the Central District of California, for the purpose of
maintaining and increasing position in the Avenues and Drew

1  Street gang, an enterprise engaged in racketeering activity,

2  defendants J. LEON, LARA, and S. MARTINEZ unlawfully did assault

3  individuals with a dangerous weapon, namely, firearms, in

4  violation of California Penal Code Sections 240, and in violation

5  of Title 18, United States Code, Section 1959(a)(3).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT FOUR

[18 U.S.C. § 1959(a)(5)]

1.    Paragraphs One through Twelve of the General Allegations and Paragraphs Two and Three of Count Three are hereby incorporated and re-alleged herein as if set forth in full.

2.    On or about February 21, 2008, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in the Avenues and Drew Street gang, an enterprise engaged in racketeering activity, defendants R. CARRILLO, GOMEZ, and VALENCIA unlawfully conspired to murder rival gang member M.S., in violation of California Penal Code, Sections 21a, 31, 182, and 187, all in violation of Title 18, United States Code, Section 1959(a)(5).

51

COUNT FIVE

[18 U.S.C. § 1959(a)(1)]

1.    Paragraphs One through Twelve of the General Allegations and Paragraphs Two and Three of Count Three are hereby incorporated and re-alleged herein as if set forth in full.

2.    On or about February 21, 2008, within the Central District of California and elsewhere, for the purpose of maintaining and increasing position in the Avenues and Drew Street gang, an enterprise engaged in racketeering activity, defendant GOMEZ unlawfully and knowingly murdered M.S., in violation of California Penal Code Sections 31 and 187, all in violation of Title 18, United States Code, Section 1959(a)(1).

COUNT SIX

[18 U.S.C. § 1959(a)(5)]

1.    Paragraphs One through Twelve of the General
Allegations and Paragraphs Two and Three of Count Three are
hereby incorporated and re-alleged herein as if set forth in
full.

2.    On or about February 21, 2008, in Los Angeles County,
within the Central District of California, for the purpose of
maintaining and increasing position in the Avenues and Drew
Street gang, an enterprise engaged in racketeering activity,
defendant GOMEZ attempted to murder Los Angeles Police Department
Officers Langarica and Baine, in violation of California Penal
Code, Sections 31, 664, and 187, all in violation of Title 18,
United States Code, Section 1959(a)(5).

COUNT SEVEN

[18 U.S.C. § 1959(a)(1)]

1.    Paragraphs One through Twelve of the General
Allegations and Paragraphs Two and Three of Count Three are
hereby incorporated and re-alleged herein as if set forth in
full.

2.    On or about March 9, 2007, within the Central District
of California and elsewhere, for the purpose of maintaining and
increasing position in the Avenues and Drew Street gang, an
enterprise engaged in racketeering activity, defendant VALENCIA
unlawfully, willfully, deliberately, and with premeditation
killed with malice aforethought M.F., in violation of California
Penal Code Sections 31, 187, and 189, all in violation of Title
18, United States Code, Section 1959(a)(1).

54

COUNT EIGHT

[18 U.S.C. § 1959(a)(5)]

1.    Paragraphs One through Twelve of the General
Allegations and Paragraphs Two and Three of Count Three are
hereby incorporated and re-alleged herein as if set forth in
full.

2.    On or about March 9, 2008, in Los Angeles County,
within the Central District of California, for the purpose of
maintaining and increasing position in the Avenues and Drew
Street gang, an enterprise engaged in racketeering activity,
defendant VALENCIA did attempt to murder J.M., in violation of
California Penal Code, Sections 31, 664, and 187, all in
violation of Title 18, United States Code, Section 1959(a)(5).

COUNT NINE

[18 U.S.C. § 1959(a)(3)]

1.   Paragraphs One through Twelve of the General Allegations and Paragraphs Two and Three of Count Three are hereby incorporated and re-alleged herein as if set forth in full.

2.   On or about March 29, 2008, in Los Angeles County, within the Central District of California, for the purpose of maintaining and increasing position in the Avenues and Drew Street gang, an enterprise engaged in racketeering activity, defendants GANDARA and CERVANTES unlawfully did assault individuals with a dangerous weapon, namely, firearms, in violation of California Penal Code Sections 240, and in violation of Title 18, United States Code, Section 1959(a)(3).

56

COUNT TEN

[21 U.S.C. § 846]

1.    Paragraphs One through Twelve of the Introductory
Allegations are re-alleged and incorporated herein by reference
as though fully set forth herein.

A.    OBJECTS OF THE CONSPIRACY

Beginning on a date unknown, and continuing to on or about
June 4, 2008, in Los Angeles County, within the Central District
of California, and elsewhere, defendants J. LEON, VALENCIA, S.
MARTINEZ, R. CARRILLO, LARA, CATALAN, I. CATALAN, GANDARA, J.
ALVARADO, LEMUS, CARBAJAL, LOPEZ, OCAMPO, REAL-AMPUDE, VENCES, R.
AVILES, J. AVILES, GUILLEN, and CERVANTES, and others known and
unknown to the Grand Jury, knowingly and intentionally conspired
and agreed with each other to commit the following offenses:

1.    To distribute 50 grams or more of a mixture or substance
containing a detectable amount of cocaine base in the form of
crack cocaine ("crack cocaine"), in violation of Title 21, United
States Code, Sections 841(a)(1) and 841(b)(1)(A)(iii);

2.    To distribute 5 grams or more of a mixture or substance
containing a detectable amount of crack cocaine, a schedule II
controlled substance, in violation of Title 21, United States
Code, Sections 841(a)(1) and 841(b)(1)(B)(iii);

3.    To distribute 500 grams or more of a mixture or
substance containing a detectable amount of cocaine, a schedule
II narcotic drug controlled substance, in violation of Title 21,
United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii);

4.    To distribute 50 grams or more of actual
methamphetamine, in violation of Title 21, United States Code,

57

1  Sections 841(a)(1) and 841(b)(1)(A)(viii); and

2      5.  To distribute 5 grams or more of actual methamphetamine,

3  a schedule II controlled substance, in violation of Title 21,

4  United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii).

5  B.  <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE</u>

6      <u>ACCOMPLISHED</u>

7      The objects of the conspiracy were to be accomplished in

8  substance as follows:

9      1.  Co-conspirators Francisco Real and Jesus Martinez, Jr.,

10 and others, would obtain crack cocaine, methamphetamine, and

11 cocaine from defendants CATALAN and I. CATALAN, and other

12 suppliers.

13     2.  Co-conspirators Francisco Real and Jesus Martinez, Jr.,

14 and others, would provide quantities of crack cocaine,

15 methamphetamine, and cocaine for distribution to defendants J.

16 LEON, VALENCIA, S. MARTINEZ, R. CARRILLO, LARA, GANDARA, J.

17 ALVARADO, LOPEZ, OCAMPO, REAL-AMPUDE, VENCES, R. AVILES, J.

18 AVILES, and GUILLEN, and others.

19     3.  Defendants J. LEON, VALENCIA, S. MARTINEZ, R. CARRILLO,

20 LARA, CATALAN, I. CATALAN, GANDARA, J. ALVARADO, LEMUS, LOPEZ,

21 OCAMPO, REAL-AMPUDE, VENCES, R. AVILES, J. AVILES, and GUILLEN,

22 and others, would distribute crack cocaine, methamphetamine, and

23 cocaine in the area controlled by the Avenues and Drew Street

24 gang.

25     4.  Defendant CARBAJAL and co-conspirators Francisco Real,

26 Jesus Martinez, Jr., and Eric Alvarado, and others, would extort

27 and collect "tax" payments from narcotics traffickers in the area

28 controlled by the Avenues and Drew Street gang.

58

5.     Co-conspirators Francisco Real and Jesus Martinez, Jr.,
would deliver to co-conspirators James Campbell and Neo Perez
payment for a portion of the "taxes" owed by Francisco Real and
the Avenues and Drew Street gang to the Mexican Mafia.

6.     Co-conspirator Francisco Real and others would obtain
firearms from co-conspirator Misael Carrillo and others and
provide them to Avenues and Drew Street gang members in order to
enforce the authority of the Avenues and Drew Street gang to
distribute narcotics in the area controlled by the gang.

7.     Defendants R. CARRILLO, GOMEZ, VALENCIA, and CERVANTES,
and co-conspirators Francisco Real, Christian Serrano, Noe
Segura, and Rigoberto Perez, would use firearms to threaten,
retaliate against, attempt to kill, and kill rival gang members,
law enforcement officers, and potential witnesses of criminal
activities committed by Avenues or Drew Street gang members in
order to enforce the authority of the gang.

8.     Francisco Real would recruit juveniles and direct their
initiation into the Avenues and Drew Street gang.

C.     OVERT ACTS

In furtherance of the conspiracy, and to accomplish the
objects of the conspiracy, defendants J. LEON, VALENCIA, S.
MARTINEZ, R. CARRILLO, LARA, CATALAN, I. CATALAN, GANDARA, J.
ALVARADO, LEMUS, CARBAJAL, LOPEZ, OCAMPO, REAL-AMPUDE, VENCES, R.
AVILES, J. AVILES, GUILLEN, and CERVANTES, and others known and
unknown to the Grand Jury, committed various overt acts, within
the Central District of California and elsewhere, including overt
acts numbered 1 through 119 as set forth in Count Two and hereby
incorporated by reference, on or about the dates noted therein.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii)]

On or about October 18, 2007, in Los Angeles County, within the Central District of California, defendant GUILLERMO OCAMPO, also known as ("aka") "Slim," knowingly and intentionally possessed with the intent to distribute more than 5 grams, that is, approximately 5.45 grams, of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii)]

On or about March 17, 2008, in Los Angeles County, within the Central District of California, defendant LENNIN CATALAN knowingly and intentionally possessed with the intent to distribute more than 50 grams, that is, approximately 111.9 grams, of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii)]

On or about April 10, 2008, in Los Angeles County, within the Central District of California, defendants LENNIN CATALAN and IMELDA CATALAN knowingly and intentionally possessed with the intent to distribute more than 50 grams, that is, approximately 502.8 grams, of cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance.

COUNT FOURTEEN

[18 U.S.C. § 922(g)(1)]

On or about November 26, 2007, in Los Angeles County, within the Central District of California, defendants JOSE LEON, also known as ("aka") "Nene" ("J. LEON"), and SERGIO MARTINEZ, aka "Bird" ("S. MARTINEZ"), knowingly possessed at least one of the following firearms: a SWD—11 9 mm assault rifle, serial number 890008760; and a Ruger P85 9 mm handgun, serial number 30123669, in and affecting interstate and foreign commerce.

Such possession occurred after defendant J. LEON had been convicted of at least one of the following crimes punishable by imprisonment for a term exceeding one year: (1) Possession of Cocaine Base for Sale, in violation of California Health & Safety Code Section 11359; (2) Possession of Marijuana for Sale, in violation of California Health & Safety Code Section 11351; (3) Possession of a Controlled Substance, in violation of California Health & Safety Code Section 12280B; (4) Possession of an Assault Weapon, in violation of California Penal Code Section 12303.2; and (5) Possession of an Explosive Device, in violation of California Penal Code Section 11378, all in the Los Angeles Superior Court, Case Number BA238503, on or about February 19, 2003.

Such possession also occurred after defendant S. MARTINEZ had been convicted of at least one of the following crimes punishable by imprisonment for a term exceeding one year: (1) Possession of a Controlled Substance for Sale, in violation of California Health & Safety Code Section 11378; and (2) Transportation of a Controlled Substance, in violation of

63

1  California Health and Safety Code Section 11352A, both in the Los

2  Angeles Superior Court, Case Number BA28035603, on or about

3  December 10, 2004.

COUNT FIFTEEN

[18 U.S.C. § 924(c)]

On or about October 18, 2007, in Los Angeles County, within the Central District of California, defendant GUILLERMO OCAMPO, also known as ("aka") "Slim," knowingly possessed firearms, namely, a loaded Harrington and Richardson .32 caliber revolver, serial number 454990, during and in relation to, and in furtherance of, a drug trafficking crime, namely, conspiracy to distribute cocaine base in the form of crack cocaine, a schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and a crime of violence, namely, the racketeering offense set forth in Count One of this Indictment, a violation of Title 18, United States Code, Section 1962(c), and the racketeering conspiracy set forth in Count Two of this Indictment, a violation of Title 18, United States Code, Section 1962(d).

COUNT SIXTEEN

[18 U.S.C. § 924(c); 18 U.S.C. § 2(a)]

On or about November 26, 2007, in Los Angeles County, within the Central District of California, defendants JOSE LEON, also known as ("aka") "NeNe," SERGIO MARTINEZ, aka "Bird," and JORGE LARA, aka "Oso," aiding and abetting each other, knowingly used, carried, possessed, brandished, and discharged firearms, namely, a loaded M-11 9 mm assault rifle, serial number 890008760, and a loaded Ruger P85 9 mm handgun, a serial number 30123669, during and in relation to, and in furtherance of, a crime of violence, namely, the racketeering offense set forth in Count One of this Indictment (specifically, the robbery set forth in Racketeering Act 10), a violation of Title 18, United States Code, Section 1962(c), and the conspiracy set forth in Count Two of this Indictment, a violation of Title 18, United States Code, Section 1962(d).

COUNT SEVENTEEN

[18 U.S.C. § 924(c); 18 U.S.C. § 2(a)]

On or about February 21, 2008, in Los Angeles County, within
the Central District of California, defendants ALEX VALENCIA,
also known as ("aka") "Gunner," RAFAEL CARRILLO, aka "Stomper,"
and JOSE GOMEZ, aka "Rival," aiding and abetting each other,
knowingly used, carried, possessed, brandished, and discharged
firearms, namely, a Polytech AK-47 7.62 mm, serial number P47-
05892, and a Grendel P-12 .380 caliber handgun, a serial number
6960, during and in relation to, and in furtherance of, a crime
of violence, namely, the racketeering offense set forth in Count
One of this Indictment (specifically, the conspiracy to commit
murder of M.S. and the attempted murder of police officers set
forth in Racketeering Acts 18 and 19), a violation of Title 18,
United States Code, Section 1962(c), and the racketeering
conspiracy set forth in Count Two of this Indictment, a violation
of Title 18, United States Code, Section 1962(d).

COUNT EIGHTEEN

[18 U.S.C. § 924(c)]

On or about March 29, 2008, in Los Angeles County, within
the Central District of California, defendants ANDREW GANDARA,
also known as ("aka") "Lil Silent," and CARLOS CERVANTES, aka
"Psycho," knowingly used, carried, possessed and brandished a
firearm, namely, a loaded KSI 9 mm semi-automatic handgun, serial
number 39000723, during and in relation to, and in furtherance
of, a crime violence, namely, the racketeering offense set forth
in Count One of this Indictment (specifically, the robbery set
forth in Racketeering Act 25), a violation of Title 18, United
States Code, Section 1962(c), and the conspiracy set forth in
Count Two of this Indictment, a violation of Title 18, United
States Code, Section 1962(d).

COUNT NINETEEN

[18 U.S.C. § 924(c)]

On or about May 22, 2008, in Los Angeles County, within the Central District of California, defendant JUAN LEMUS, also known as "Bola," knowingly possessed a firearm, namely, a .25 caliber ACP handgun, serial number DK30515, during and in relation to, and in furtherance of, a drug trafficking crime, namely, conspiracy to distribute cocaine base in the form of crack cocaine ("crack cocaine"), a schedule II narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and possession with the intent to distribute crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1), and a crime of violence, namely, the racketeering offense set forth in Count One of this Indictment, a violation of Title 18, United States Code, Section 1962(c), and the racketeering conspiracy set forth in Count Two of this Indictment, a violation of Title 18, United States Code, Section 1962(d).

COUNT TWENTY

[18 U.S.C. § 1956(h)]

A.    OBJECT OF THE CONSPIRACY

Beginning on a date unknown and continuing until on or about June 4, 2008, in Los Angeles County, within the Central District of California, and elsewhere, defendants JOSE LEON, known as ("aka") "NeNe" ("J. LEON") and RAUL CARBAJAL, aka "Raton" ("CARBAJAL"), and others known and unknown to the Grand Jury, knowingly and intentionally conspired and agreed with each other to conduct financial transactions, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and which property was, in fact, the proceeds of specified unlawful activity, that is, conspiracy to distribute cocaine base in the form of crack cocaine ("crack cocaine"), methamphetamine, and cocaine, with the intent to promote the carrying on of said specified unlawful activity, and to conceal and disguise the nature, location, source, ownership, and control the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i).

B.    MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished in substance as follows:

1.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 8 of Count Two setting forth the means described in the conspiracy charged in Count Two of this Indictment.

70

2. The Grand Jury re-alleges and incorporates by reference
paragraphs 1 through 8 of Count Ten setting forth the means
described in the conspiracy charged in Count Ten of this
Indictment.

3. Co-conspirators Francisco Real, Maria Leon, and Nicholas
Real, and others, would conspire and arrange with others to
obtain crack cocaine and methamphetamine.

4. Defendant J. LEON and co-conspirators Francisco Real,
Maria Leon, and Nicholas Real, and others, would sell and direct
others to sell crack cocaine and methamphetamine and collect the
proceeds from the illegal distribution of crack cocaine and
methamphetamine.

5. Defendants CARBAJAL and co-conspirators Francisco Real,
Maria Leon, and Daisy Valencia, and others, would maintain Bank
of America bank accounts to maintain the proceeds from illegal
methamphetamine and crack cocaine distribution.

6. Defendant J. LEON and co-conspirators Francisco Real,
Maria Leon, and Nicholas Real, would provide proceeds from the
Bank of America accounts, as well as additional amounts of United
States currency, to a co-conspirator.

7. Co-conspirator Joanna Fuerte would record title in her
name on vehicles in order to conceal co-conspirator Francisco
Real's involvement in crack cocaine and methamphetamine
trafficking.

8. Defendant CARBAJAL would purchase and take title in
residential property in his name in order to conceal the
involvement of defendant J. LEON, and co-conspirators Francisco
Real, Maria Leon, and Nicholas Real, and others, in crack cocaine

1  and methamphetamine trafficking.

2  C.    OVERT ACTS

3        In furtherance of the conspiracy, and to accomplish the

4  objects of the conspiracy, defendants J. LEON and CARBAJAL, and

5  others known and unknown to the Grand Jury, committed various

6  overt acts on or about the following dates, within the Central

7  District of California and elsewhere, including but not limited

8  to the following:

9        1-119.  The Grand Jury re-alleges and incorporates by

10 reference paragraphs 1 through 119 of Count Two setting forth the

11 overt acts of the conspiracy charged in Count Two of this

12 Indictment.

13       120. On March 9, 2006, defendant CARBAJAL submitted United

14 States Postal Service money orders for $2,000 to First American

15 Title Company as a down payment for the purchase of a residence

16 located on Falcon Trail, Victorville, California ("the Falcon

17 Trail residence").

18       121. On April 3, 2006, defendant CARBAJAL completed a

19 Uniform Residential Loan Application requesting funding to

20 purchase the Falcon Trail residence.

21       121. On April 5, 2006, defendant CARBAJAL submitted United

22 States Postal Service money orders for $5,500 to First American

23 Title Company as a down payment for the purchase of the Falcon

24 Trail residence.

25       122. On April 10, 2006, defendant CARBAJAL purchased the

26 Falcon Trail residence for defendant J. LEON and co-conspirators

27 Francisco Real, Maria Leon, and Nicholas Real.

28       123. On June 2, 2006, defendant J. LEON and co-conspirators

Francisco Real, Maria Leon, and Nicholas Real provided $3,120 to
co-conspirator Daisy Valencia to deposit into Daisy Valencia's
Bank of America account so that Daisy Valencia could make a
payment on the Falcon Trail residence.

124. On June 2, 2006, co-conspirator Daisy Valencia
deposited $3,120 into her Bank of America account.

125. On June 6 2006, co-conspirator Daisy Valencia provided
Bank of America checks in the amounts of $2,243.92 and $874.82 to
New Century Mortgage Corporation as payment on the Falcon Trail
residence.

126. On July 11, 2006, defendant J. LEON and co-conspirators
Francisco Real, Maria Leon, and Nicholas Real provided $3,120 to
co-conspirator Daisy Valencia for payment on the Falcon Trail
residence.

127. On July 11, 2006, co-conspirator Daisy Valencia
deposited $3,120 into her Bank of America account.

128. On July 18, 2006, co-conspirator Daisy Valencia
authorized electronic mortgage payments of $2,243.92 and $874.82
from her Bank of America account to New Century Mortgage
Corporation for payment on the Falcon Trail residence.

129. On August 9, 2006, defendant J. LEON and co-
conspirators Francisco Real, Maria Leon, and Nicholas Real
provided $3,120 to co-conspirator Daisy Valencia for payment on
the Falcon Trail residence.

130. On August 9, 2006, co-conspirator Daisy Valencia
deposited $3,120 into her Bank of America account.

131. On August 11, 2006, co-conspirator Daisy Valencia
authorized electronic mortgage payments of $2,243.92 and $874.82

73

1  from her Bank of America account to New Century Mortgage
2  Corporation for payment on the Falcon Trail residence.

3      132. On September 7, 2006, defendant J. LEON and co-
4  conspirators Francisco Real, Maria Leon, and Nicholas Real
5  provided $3,180 to co-conspirator Daisy Valencia for payment on
6  the Falcon Trail residence.

7      133. On September 7, 2006, co-conspirator Daisy Valencia
8  deposited $3,180 into her Bank of America account.

9      134. On September 15, 2006, co-conspirator Daisy Valencia
10 authorized electronic mortgage payments of $2,258.92 and $874.82
11 from her Bank of America account to New Century Mortgage
12 Corporation for payment on the Falcon Trail residence.

13     135. On October 3, 2006, defendant J. LEON and co-
14 conspirators Francisco Real, Maria Leon, and Nicholas Real
15 provided $3,300 to co-conspirator Daisy Valencia for payment on
16 the Falcon Trail residence.

17     136. On October 3, 2006, co-conspirator Daisy Valencia
18 deposited $3,300 into her Bank of America account.

19     137. On October 5, 2006, co-conspirator Daisy Valencia
20 authorized electronic mortgage payments of $2,243.92 and $889.82
21 from her Bank of America account to New Century Mortgage
22 Corporation for payment on the Falcon Trail residence.

23     138. On November 2, 2006, defendant J. LEON and co-
24 conspirators Francisco Real, Maria Leon, and Nicholas Real
25 provided $3,135 to co-conspirator Daisy Valencia for payment on
26 the Falcon Trail residence.

27     139. On November 2, 2006, co-conspirator Daisy Valencia
28 deposited $3,135 into her Bank of America account.

140. On November 6, 2006, co-conspirator Daisy Valencia authorized an electronic mortgage payment of $2,258.92 from her Bank of America account to New Century Mortgage Corporation for payment on the Falcon Trail residence.

141. On November 15, 2006, co-conspirator Daisy Valencia authorized an electronic mortgage payment of $874.82 from her Bank of America account to HSBC Bank for payment on the Falcon Trail residence. and

142. On December 11, 2006, defendant J. LEON and co-conspirators Francisco Real, Maria Leon, and Nicholas Real provided $1,865 to co-conspirator Daisy Valencia for payment on the Falcon Trail residence.

143. On December 11, 2006, co-conspirator Daisy Valencia deposited $1,865 into her Bank of America account.

144. On December 12, 2006, defendant J. LEON and co-conspirators Francisco Real, Maria Leon, and Nicholas Real provided $2,640 to co-conspirator Daisy Valencia for payment on the Falcon Trail residence.

145. On December 12, 2006, co-conspirator Daisy Valencia deposited $2,640 into her Bank of America account.

146. On December 14, 2006, co-conspirator Daisy Valencia provided a Bank of America check in the amount of $2,243.92 to New Century Mortgage Corporation for payment on the Falcon Trail residence.

147. On December 15, 2006, co-conspirator Daisy Valencia provided a Bank of America check in the amount of $874.82 to HSBC Bank for payment on the Falcon Trail residence.

148. On January 10, 2007, defendant J. LEON and co-

conspirators Francisco Real, Maria Leon, and Nicholas Real provided $3,200 to co-conspirator Daisy Valencia for payment on the Falcon Trail residence.

149. On January 10, 2007, co-conspirator Daisy Valencia deposited $3,200 into her Bank of America account.

150. On January 11, 2007, co-conspirator Daisy Valencia provided a Bank of America check in the amount of $2,243.92 to New Century Mortgage Corporation for payment on the Falcon Trail residence.

151. On January 18, 2007, co-conspirator Daisy Valencia provided a Bank of America check in the amount of $874.82 to HSBC Bank for payment on the Falcon Trail residence.

152. On February 12, 2007, defendant J. LEON and co-conspirators Francisco Real, Maria Leon, and Nicholas Real provided $3,380 to Daisy Valencia for payment on the Falcon Trail residence.

153. On February 12, 2007, co-conspirator Daisy Valencia deposited $3,380 into her Bank of America account.

154. On February 14, 2007, co-conspirator Daisy Valencia provided a Bank of America check in the amount of $915.56 to HSBC Bank for payment on the Falcon Trail residence.

155. On February 15, 2007, co-conspirator Daisy Valencia provided a Bank of America check in the amount of $2,243.92 to New Century Mortgage Corporation for payment on the Falcon Trail residence.

156. On March 12, 2007, co-conspirator Daisy Valencia provided a Bank of America check in the amount of $2,243.92 to New Century Mortgage Corporation for payment on the Falcon Trail

residence.

157. On March 13, 2007, defendant J. LEON and co-conspirators Francisco Real, Maria Leon, and Nicholas Real provided $1,850 to co-conspirator Daisy Valencia for payment on the Falcon Trail residence.

158. On March 13, 2007, co-conspirator Daisy Valencia deposited $1,850 into her Bank of America account.

159. On March 14, 2007, defendant J. LEON and co-conspirators Francisco Real, Maria Leon, and Nicholas Real provided $1,600 to co-conspirator Daisy Valencia for payment on the Falcon Trail residence.

160. On March 14, 2007, co-conspirator Daisy Valencia deposited $1,600 into her Bank of America account.

161. On November 30, 2007, defendant J. LEON and co-conspirators Francisco Real, Maria Leon, and Nicholas Real provided $4,700 to Daisy Valencia for payment on the Falcon Trail residence.

162. On November 30, 2007, co-conspirator Daisy Valencia deposited $4,700 into her Bank of America account.

163. On December 4, 2007, Daisy Valencia provided a Bank of America check in the amount of $2,243.92 to New Century Mortgage Corporation for payment on the Falcon Trail residence.

164. On December 4, 2007, by telephone using coded language, co-conspirator Francisco Real told co-conspirator Nicholas Real that Francisco Real did not want to sell the Falcon Trail residence, but that he wanted defendant CARBAJAL to transfer the title to him, and co-conspirator Nicholas Real stated that CARBAJAL was not the actual owner of the Falcon Trail residence.

1          165. On December 5, 2007, co-conspirator Daisy Valencia
2    provided a Bank of America check in the amount of $874.82 to HSBC
3    Bank for payment on the Falcon Trail residence.

78

COUNT TWENTY-ONE

[18 U.S.C. § 982(a)(1); 21 U.S.C. § 853(a)]

1.    Pursuant to Title 21, United States Code, Section 853(a), and Title 18, United States Code, Section 982(a)(1), defendants JOSE LEON, also known as ("aka") "NeNe," ALEX VALENCIA, aka "Gunner," SERGIO MARTINEZ, aka "Bird," RAFAEL CARRILLO, aka "Stomper," JOSE GOMEZ, aka "Rival," JORGE LARA, aka "Oso," LENNIN CATALAN, IMELDA CATALAN, ANDREW GANDARA, aka "Lil Silent," JOSE ALVARADO, aka "Minor," JUAN LEMUS, aka "Bola," RAUL CARBAJAL, aka "Raton," MIGUEL LOPEZ, aka "Shooter," MIGUEL VENANCIO, GUILLERMO OCAMPO, aka "Slim," GERMAN REAL-AMPUDE, aka "Chispas," VALENTIN VENCES, RAFAEL AVILES, aka "Rafa," JOSE AVILES, aka "Papucho," RAFAEL GARCIA, DANIEL GUILLEN, and CARLOS ANTHONY CERVANTES, aka "Psycho," shall forfeit to the United States the following property:

a.    All right, title, and interest in  –

(i)  any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of any of the offenses described in Counts One through Twenty;

(ii) any property, real or personal, used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, any of the offenses described in Counts One through Twenty; and

(iii)any property, real or personal, which was involved in any of the offenses described in

79

Counts One through Twenty, or

traceable to such property.

The property described in paragraph 1(a)(i), (ii), and (iii) includes, without limitation the residence located at 13241 Falcon Trail, in Victorville, California.

b.    A sum of money equal to the total value of the property described in paragraph 1(a)(i), (ii) and (iii). If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable for the amount involved in such offense.

2.    Pursuant to Title 21, United States Code, Section 853(p), each defendant shall forfeit substitute property, up to the value of the total amount described in paragraph 1(a), if, as the result of any act or omission of said defendant, said property, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the

//
//
//
//
//
//
//
//
//

jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/s/
_____
Foreperson

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Violent and Organized Crime Section

CHRISTOPHER BRUNWIN
Assistant United States Attorney
Deputy Chief, Violent and Organized Crime Section

ARIEL A. NEUMAN
Assistant United States Attorney
Violent and Organized Crime Section